## Mutual Benefit Life Insurance Co. v. Emig's Admrs.

(Decided December 5, 1911.)

### Appeal from Campbell Circuit Court.

1. Life Insurance—Premium—Provisions of Policy.—Under a policy issued before the adoption of section 659, Kentucky Statutes, the rights of the policy holder who fails to pay a premium must be determined by the provisions of the policy, although a change in the non-forfeiture provisions of the policy was made after the passage of the statute.

2. Extended Insurance—Reserved Surplus.—The fact that a life insurance company reserved 20 per cent. of its surplus annually in declaring dividends, does not entitle the policy holder to extended insurance because of this fact.

3. Reducing Rates—Statute Not Retrospective.—A life insurance company may reduce its rates, and this does not affect policies previously issued. The statute is not retrospective.

W. O. HARRIS for appellant.

L. J. CRAWFORD, ROBERT A. NAGEL and HAZELRIGG & HAZELRIGG for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE HOBSON— Reversing.

In the opinion delivered on a former appeal of this case, see 127 Ky., 588, it was found that after deducting from the net reserve of the policy, which was $1,001.95, the sum of Emig's debt and interest amounting to $905.61, there would be left to his credit for the purpose of purchasing extended insurance $95.50. But this is error, as the difference between the two amounts is in fact $96.34. And it was held that in addition to this, he was entitled for the same purpose to the dividend on his policy for the year 1903. In concluding the opinion the Court said:

"We are not prepared to say upon the record before us what balance was due Emig on March 20, 1903, computed upon the basis herein indicated. Upon a return

of the case, evidence may be taken by both parties, and the court will ascertain and adjudge the full amount that Emig was entitled to on March 20, 1903, and after deducting therefrom the amount of his debt and interest, will compute the period for which the balance due would purchase extended insurance, and if the extended insurance carried the policy beyond the time of Emig's death judgment will be rendered in favor of appellee for the amount of the policy and interest from the time it was due; otherwise the judgment will be for appellant.''

Upon a return of the case Emig's administrator filed an amended and supplemental petition, in which it is averred that Emig when his policy lapsed on March 20, 1903, was entitled by the terms of the policy to at least $1,051.95, and that in estimating the net reserve the company deducted therefrom without having the legal right so to do, one per cent of the face value of the policy, to-wit: Fifty Dollars. It was further set out that Emig was entitled to dividends and apportionments of surplus upon the policy each year from the date of its issual in 1893 to 1903, when he let it lapse, inclusive, sufficient in amount when added to the reserve to carry the policy in force for its full face value to a day beyond the time of his death on June 1, 1904; that for these years the company earned, and had sufficient profits and surplus to enable it to apportion and add to the policy for these years a sum sufficient to carry it beyond his death, but failed and refused to appropriate to such purpose for any of these years the full dividend and surplus to which the policy was entitled. It was further averred that the defendant company was a mutual life insurance company, and by its charter the policy was entitled to share ratably and proportionately with all other participating policy holders in the profits and surplus of the company during every year from the date of the policy to the 20th day of March, 1903.

In its answer to this pleading the company after traversing its allegations, affirmatively pleaded that the dividends for the year ending March 20, 1903, to which the policy was entitled, amounted to $40.10, and this when added to $96.34 made $134.36, to be applied to the purchase of extended insurance, and according to the rates in force at the date of the policy this sum would purchase extended insurance for one year and 68 days, or from March 20, 1903, until May 27, 1904, which last mentioned day was three days before the death of

Emig. It further averred that under its charter the directors had authority to adopt by-laws, fixing the method by which profits and surplus should be ascertained and distributed, and that in pursuance of this power the directors did adopt a by-law providing that ''The surplus of the company may be distributed from time to time as the board may direct.'' That in each of the years during the time the policy was in force the directors in pursuance of the by-laws and computations made by its actuaries appropriated the surplus of the previous year's business to the payment of dividends to policy holders, including Emig, which dividends were duly credited.

Evidence was taken by both parties in the form of depositions, and the law and facts being submitted to the court it was adjudged that Emig's administrator recover from the company the amount of the policy and interest.

It will be observed that according to the computation made by the company the amounts to which Emig was entitled carried his insurance to within three days of his death. On the other hand, it is the contention of the administrator that the sums to which he was entitled were sufficient to and did carry his insurance beyond the period of his death. The disposition of the case depends on what dividends Emig was entitled to.

The policy provided that—

''When after two full annual premiums shall have been paid on this policy, it shall cease or become void solely by the nonpayment of any premium when due. Its entire net reserve by the American Experience Mortality and interest at four per cent yearly * * * * shall be applied by the company as a single premium at the company's rates published and in force at this date, either, first, to the purchase of non-participating term insurance for the full amount insured by this policy.'' * * *

The charter of the company, in section 7, declares that—

''The directors for the time being, or a majority of them, shall have power to make and prescribe such by-laws, rules and regulations as to them shall appear needful and proper for the management and disposition of the stock, property, assets and effects of the said corporation, and for all such matters as appertain to the business thereof, and shall have power to appoint an actuary from among themselves; * * * * provided that such by-laws, rules and regulations shall not be repugnant to the

constitution or laws of the United States or of this State."

In by-law section 22, it is provided that—

"There shall be a mathematician of the company, who shall be appointed by and shall hold his office during the pleasure of the board. It shall be his duty to make all necessary computations relating to premiums, rates, dividends, reserves and surrender values upon principles recognized and approved by the board."

And in by-law section 26 it is provided that—

"The surplus of the company may be distributed from time to time as the board may direct."

It is shown by the evidence that during each of the years from the date of the policy to March 20, 1903, when it lapsed, the board of directors made an annual distribution of surplus to all the policies entitled thereto, and that Emig received his proportionate part of the surplus so distributed—the amount varying slightly each year, being for example $41.55 in 1894 and $40.10 in 1903. But the directors did not distribute all of the surplus—reserving about twenty per cent for the purpose of defraying expenses and protecting the company against contingencies that might arise. In other words, if the whole of the surplus had been distributed, and Emig's policy had received its part during the time he was entitled to participate in the distribution of the surplus, namely, from the date of the policy until he permitted it to lapse by the non-payment of premium, the amount to which he was entitled would have been sufficient to carry his insurance beyond the period of his death. But, if he was only entitled to so much of the surplus as was distributed by the directors, and they had the right to retain undistributed the amount they did, the sums to which he was entitled during the period mentioned were not sufficient to carry the insurance to the time of his death.

It is also shown by an expert accountant that if there had been distributed to Emig's policy each year during its life, that the amount so distributed would have carried the policy one year and 154 days after default of the payment of the premium in March, 1903, or some 83 days beyond his death. But this calculation was based on the theory that the company appropriated or distributed the entire surplus to which the policy was entitled. He further said that if twenty per cent of the surplus was retained, that the amount due Emig as extended insurance would only carry his policy for one year and 68 days—

the time fixed by the experts who testified in behalf of the company. This expert, on cross-examination, was asked these questions:

"Q. I hand you a copy of the policy of insurance in controversy and call your attention to the non-forfeiture provision, and ask you to state whether it provides that a non-participating term of insurance be granted by the company in the event of default of premium payment is to be purchased at net rates or at the company's pub-lished rates?"

"A. At the company's published rates, I know that."

"Q. I hand you a copy of the company's published rates introduced in evidence in this case, and ask you to compute the term of insurance which the sum of $136.44 would buy according to these rates, the age of the in-sured being 56 years and the amount of the insurance be-ing $5,000.00?"

"A. It is one year and 68 days."

"Q. Then, in computing the term of one year and 154 days you did not follow the language of the contract in the suit?"

"A. At the time I computed I did not know what these values were there. Mr. Nagle came and asked me to compute the extended term of insurance on the data that he gave me and I computed it.

"Q. With the contract before you, together with the company's published rates therein referred to, you find the term to be one year and 68 days?"

"A. According to these tables, yes."

The evidence makes plain two propositions: First— that if the directors had the right to retain twenty per cent of the surplus to which Emig's policy was entitled to cover contingencies, then his extended insurance did not carry the policy to the date of his death. On the other hand, if he was entitled to have applied to his pol-icy the proportionate part of the surplus the ex-tended insurance that this would purchase, it would carry the policy beyond the date of his death. So that, in its last analysis, the issue comes down to the question whether or not the directors had the power to retain the per cent of the surplus that they did. There is also another question that should be noticed. The company after 1897 reduced its rates on policies then taken, that is, it issued new policies at a lower rate than that spec-ified in the policy sued on. It is insisted that Emig was

entitled to the benefit of the reduction on the premiums he paid. We will take up the two questions in the order stated.

As to his right to participate in the twenty per cent surplus the contract here is not practically different from the one before us in Mutual Benefit Life Ins. Co. v. O'Brien, 116 S. W., 750. The policy in that case was issued by the same company and the same question was made. Holding that the policy holder was not entitled to participate in the surplus we said:

"The contract provided that the matter of dividends should be regulated by the board of directors. Not only so, but the stipulation as to extended insurance expressly provides that the policy will be automatically extended without participation in surplus for the full amount of the policy. The prompt payment of premiums is essential to a life insurance company, and, in stipulating for extended insurance in case of default in the payment of premiums, the company may provide that this extension of the policy shall be without participation in the surplus. The value of life insurance is dependent upon the large number of policies which are kept in force. To induce the members to remain in the association and to pay their premiums is to protect every policy holder in the company. In the previous dividends which each policy holder has received he has enjoyed the advantage or dividends paid upon subsisting policies and denied to those who had not paid their premiums, thus receiving a larger amount than he would otherwise have received. The surrender values are also calculated upon the same basis, so that to strike this out would be to strike out the basis upon which the whole scheme was calculated."

The same view was taken by the United States Supreme Court in Equitable Life Ins. Co. v. Brown, 213 U. S. 47. Referring to contract provisions not unlike those before us, the court defining the rights of the policy holder, said:

"By that contract he was entitled to participate in the distribution of some part of the surplus, according to principles and methods that might be adopted from time to time by the defendant for such distribution, which principles and methods were ratified and accepted by and for every person who should have or claim any interest under the policy. It has been held that, under such a policy, how much of the surplus shall be distributed to the

policy holder and how much shall be held for the security of the defendant and its members is to be decided by the officers and management of the defendant, in the exercise of their discretion to distribute, having in mind the present and future business, and, in the absence of any allegations of wrongdoing or mistake by them, their determination must be treated as proper, and their apportionment of the surplus is to be regarded prima facie as equitable.''

Under the principles laid down in these opinions, there can be no extended insurance by reason of the retaining by the company of the twenty per cent surplus.

As to the second question, Section 656, Ky. St., is relied on. It provides:

''No life insurance company doing business in Kentucky shall make or permit any distinction or discrimination in favor of individuals between insurants of the same class and equal expectation of life in the amount or payment of premiums or rates charged for the policies of life or endowment insurance, or in the dividends or other benefit payable thereon, or in any other of the terms and conditions of the contracts it makes.''

This statute was passed after the contract in this case was made. The State cannot impair the obligation of an existing contract. The statute is prospective in its operation, it is not retrospective; it has no application to existing contracts made before its adoption. If the insurance company had raised its rates after issuing the policy in question, such a raise in its rates would not have effected Emig's rights, and in the same way when it afterwards lowered its rates, his rights were not affected for he is no more affected by a lowering of the rates than he would be by a raise of them after his policy was issued. The statute was only intended to secure equality between policy holders having equal rights. If the company at the time that one policy is issued, issues other policies at different rates, thus discriminating between policy holders standing on equality, the statute would apply. But it was not the purpose of the statute to prevent an insurance company from ever changing its rates and this would be its effect if it was construed as contended by appellee.

The policy in this case was issued in 1893, before the adoption of section 659, Kentucky Statutes. The rights of the policy holder are, therefore, not controlled by the statutes and as we held in the O'Brien case above re-

ferred to, the right to extended insurance must depend upon the contract. It is true a slight change in the non-forfeiture provisions of the policy was made by a supplemental agreement between the parties made in 1897, but this supplemental agreement modifying simply the non-forfeiture provisions of the contract, did not otherwise affect it or change its character as a contract made in 1893. Under the statute the policy holder who has paid three full years premiums is entitled to a paid-up policy and not to extended insurance. In the former opinion in this case it was held that the only question to be determined was whether the extended insurance to which Emig was entitled kept the policy alive until his death. The reason for this ruling was that the statute did not apply to the policy. The opinion then delivered is the law of the case.

The record does not show that any reduction was made from the net reserve except for the debt, and as the balance coming to the insured including the dividends, did not extend the insurance to his death, there can be no recovery under the policy.

Judgment reversed and cause remanded for a judgment as above indicated.